IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| TRAVIS RYAN YOUNG, | § | Case No. 17-30163-hcm |
| | § | |
| Debtor. | § | |
| | § | |
| ——————————————— | § | |
| | § | |
| PAMELA YOUNG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 17-03010-hcm |
| | § | |
| TRAVIS RYAN YOUNG, Individually | § | |
| and d/b/a PREMIER BUILDERS, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S SECOND MOTION TO COMPEL
## AND FOR SANCTIONS AGAINST KEITH YOUNG

TO THE HONORABLE H. CHRISTOPHER MOTT, U.S. BANKRUPTCY JUDGE:

COMES NOW Plaintiff, PAMELA YOUNG (hereinafter "Plaintiff"), by and through

her attorneys, James & Haugland, P.C., and files this, her Second Motion to Compel and for

Sanctions Against Keith Young, and in support thereof would respectfully show the Court

the following:

# I. FACTS

### A. The Debtor Files Bankruptcy and Testifies That His Father, Keith Young, Provided Most of the Financing for Debtor's Business

1.  On February 3, 2017, Travis Ryan Young (hereinafter "Debtor") filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code [Bankr. Doc. # 1].

2.  In his April 4, 2017 2004 Examination, the Debtor testified that he has been engaged in the home building business since approximately 2008.[1] See Exhibit P-1 at 7:6-12. The Debtor also testified that his father, Keith Young, provided financing for most of his construction projects. See Exhibit P-1 at 7:22-8:1;10:22-11:1; 12:16-13:14; 14:18-25; 17:9-14; 26:22-27:3; 34:9-16; 61:13-15. Debtor further testified that instead of charging the Debtor interest on the financing, Keith Young would charge him an agreed upon fee once each house had been built and sold. See Exhibit P-1 at 28:19-29:12. The Debtor also testified that his parents were providing him with $3,000 per month in income. See Exhibit P-1 at 56:17-57:1; 62:19-63:3.

### B. Plaintiff Files This Adversary and Serves a Subpoena and Third Party Request for Production to Keith Young

3.  On May 5, 2017, Plaintiff, a creditor of the Debtor, filed this adversary proceeding objecting to the discharge of the Debtor. [Adv. Doc. # 1].

4.  On September 14, 2017, Plaintiff filed her Notice of Third Party Requests for

---

[1]A true and correct copy of the transcript of the April 4, 2017 Oral Deposition of Travis Young (a Rule 2004 Examination) is attached hereto as Exhibit P-1 and incorporated herein by reference.

Production regarding Debtor's father Keith Young in this adversary proceeding.[2]

[Adv. Doc. # 20]. See Exhibit P-2. As set forth in the Notice of Third Party Requests for Production, the Plaintiff requested the following documents from Keith Young for the time period from January 1, 2013 through January 31, 2017:

a.  All documents related to or reflecting the loan of any money by you or any financing provided by you to Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

b.  All documents related to or reflecting the gift of any money or other property by you to Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

c.  All documents relating to your federal and state income tax returns together with the Form W-2s, Form 1099s, schedules and worksheets thereof and all other papers, and memoranda referring to any adjustment made in connection therewith for the previous four (4) years (2013, 2014, 2015, and 2016).

d.  All documents relating to or reflecting any taxes paid on interest received from any loan of money by you to Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

e.  All documents relating to monies received or being presently received by you from Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC, including but not limited to payment histories, ledgers, checks, monthly statements, deposit slips, records, accounts and memoranda.

f.  All documents relating to debts which are owed to you by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC

---

[2] A true and correct copy of the Notice of Third Party Requests for Production to Keith Young is attached hereto as Exhibit P-2 and incorporated herein by reference.

including but not limited to, promissory notes, IOU notes and/or accounts receivable.

g.   All contracts or agreements or documents memorializing contracts or agreements between you and Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

h.   All documents memorializing communications by and between you and Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC relating to loans made by you to these persons or entities.

i.   All documents memorializing any ownership interest you have in Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

j.   All documents memorializing your ownership of any assets that are in the possession of Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

k.   All documents memorializing the financial condition of Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

l.   All documents memorializing any loan applications by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

m.   All documents submitted by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC to convince you to loan any of them money in order for them to engage in a construction project.

n.   All business proposals submitted to you by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

Exhibit P-2, Documents To Be Produced.

5.     On September 14, 2017, the Plaintiff, through her counsel, issued a Subpoena for Keith Young (hereinafter the "Subpoena") to produce the documents set forth in the Notice of Third Party Requests for Production.[3] [Adv. Doc. #24]. See Exhibit P-3. The Subpoena directed Keith Young to produce the requested documents no later than October 20, 2017 at the Law Offices of James & Haugland, PC. See Exhibit P-3. The Subpoena was served on Keith Young on September 29, 2017. See Exhibit P-3.

### C. Keith Young Fails and Refuses to Comply with the Subpoena and Plaintiff Files Her First Motion to Compel, for Contempt, and for Sanctions

6.     Neither Keith Young, nor any other party-in-interest moved to quash or otherwise objected to the production of the requested documents prior to October 30, 2017.

7.     Keith Young did not respond to the Subpoena on or before October 20, 2017.

8.     On October 30, 2017, the undersigned received two letters from Keith Young dated October 27, 2017.[4] The first letter stated that the letters were to have been served by Debtor's attorney, but that Keith Young just learned that the attorney [Michael R. Nevarez] is no longer representing the Debtor. See Exhibit P-4. In the second letter Keith Young lodged objections to Plaintiff's Third Party Requests for Production and failed to produce any documents responsive to Plaintiff's Requests. See Exhibit P-4.

9.     On November 17, 2017, the undersigned sent a letter to Keith Young in response to

---

[3] A true and correct copy of the Subpoena is attached hereto as Exhibit P-3 and incorporated herein by reference.

[4] True and correct copies of the two letters dated October 27, 2017 from Keith Young to the undersigned attorney are attached hereto as Exhibit P-4 and incorporated herein by reference.

his October 27, 2017 letter stating that Keith Young's objections were untimely and advising Keith Young that if the requested documents were not produced before November 24, 2017, the Plaintiff would be forced to file a motion to compel production of those documents.[5] See Exhibit P-5. Shortly thereafter, Keith Young advised the undersigned that he would not produce any documents to Plaintiff.[6] See Exhibit P-6.

10. On November 22, 2017, Plaintiff filed her first Motion to Compel, for Order of Civil Contempt, and for Sanctions Against Keith Young for Failure to Comply with Subpoena. [Adv. Doc. 39].

### D. The Court Orders Keith Young to Comply With the Subpoena and Keith Young Fails to Do So

11. On December 12, 2017, this Court entered an Order Regarding Motion to Compel, Civil Contempt, and Sanctions (Keith Young) (hereinafter the "Order") in which the Court granted Plaintiff's first Motion to Compel and ordered Keith Young to produce for inspection and copying all documents that Plaintiff had requested in her Subpoena by January 3, 2018.[7] [Adv. Doc. # 48]. The Court further ordered, *inter alia*, that:

a. By January 5, 2018, Mr. Keith Young shall also provide Plaintiff's counsel

---

[5]A true and correct copy of the November 17, 2017 letter from Corey W. Haugland to Keith Young is attached hereto as Exhibit P-5 and incorporated herein by reference.

[6]A true and correct copy of the November 21, 2017 letter from Keith Young to Corey W. Haugland is attached hereto as Exhibit P-6 and incorporated herein by reference.

[7]For the Court's convenience, a true and correct copy of the December 12, 2017 Order Regarding Motion to Compel, Civil Contempt, and Sanctions (Keith Young) is attached hereto as Exhibit P-7 and is incorporated herein by reference.

with a sworn written Response to the Subpoena, which shall set forth, by each specific Document Request in the Subpoena: (a) the responsive documents actually produced by Mr. Keith Young to Plaintiff's counsel; and (b) which requested documents could not be produced to Plaintiff's counsel because the documents do not exist. Mr. Keith Young may not respond to the Subpoena by stating that the documents have been or will be produced by some other person.

b.      The Objections by Mr. Keith Young to the Subpoena are hereby DENIED, except for the following. Mr. Keith Young shall produce for inspection by Plaintiff's counsel the federal and state tax return documents sought by Document Request No. 3 in the Subpoena. Plaintiff's counsel may not photocopy such federal and state tax return documents, unless agreed to by Mr. Keith Young. If Plaintiff believes that the information in the federal and state tax return documents are relevant, Plaintiff may file a motion with the Court to permit photocopying of such documents.

c.      If by January 3, 2018, Mr. Keith Young fails to produce the documents required by this Order, or if by January 5, 2018, Mr. Keith Young fails to provide the sworn Response to the Subpoena required by this Order, then Mr. Keith Young is hereby ordered to pay the amount of $1,600 in attorney's fees and expenses to Plaintiff's counsel and will be in civil contempt of Court. In

such event, Plaintiff will also be entitled to seek additional and further relief and sanctions from the Court against Mr. Keith Young.

[Adv. Doc. # 48].

12.     On or about January 5, 2018, Carlos Miranda delivered documents produced by Keith Young pursuant to the Order to the undersigned counsel.  The only documents produced by Keith Young were the following:

a.      Copies of 27 checks from Keith Young to the Debtor dated between 1/8/2013 and 1/10/2016.

b.      Copies of 4 checks from Keith Young to Premier Builders and Design dated between 3/7/2016 and 11/13/20016.

c.      A document created for Keith Young which listed certain transfers which were presumably made from Keith Young to the Debtor.

d.      Alleged copies of Keith Young's Federal Income Tax Returns for the years 2013-2016.  Each of these federal tax returns were redacted almost in their entirety and none of them were signed.

13.     In violation of the Order and the Subpoena, Keith Young failed to produce documents responsive to Plaintiff's Third Party Requests for Production as follows:

a.      All documents related to or reflecting the loan of money by you or any financing provided by you to Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

        i.      Failed to produce all checks cleared through the bank showing

signature and bank where it was processed.

 ii. Check numbers 2064 and 2140 are missing.

 iii. Wire transfers for the dates of 3/25/2013, 3/10/2014, 4/27/2015, 2/2/2016, 6/24/2016 are missing.

 iv. A cashier's check dated 2/18/2016 is missing.

 v. No deeds of trust or loan documents were produced.

b. All documents related to or reflecting the gift of any money or other property by you to Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

 i. No documents produced.

c. All documents relating to your federal and state income tax returns together with the Form W-2s, Form 1099s, schedules and worksheets therof and all other papers and memoranda referring to any adjustment made in connection therewith for the previous four (4) years (2013, 2014, 2015, and 2016).

 i. None of the federal tax returns produced were signed.

 ii. Unredacted tax returns were not produced to the undersigned for inspection.

 iii. The federal tax returns produced have been redacted so that they do not contain any information whatsoever.

d. All documents relating to or reflecting any taxes paid on interest received from any loan of money by you to Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

 i. No documents produced.

e. All documents relating to monies received or being presently received by you from Travis Young, Brittany Young, Premier Builders, Premier Builders &

Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC, including but not limited to payment histories, ledgers, checks, monthly statements, deposit slips, records, accounts, and memoranda.

    i.    No documents produced.

f.    All documents relating to debts which are owed to you by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC including but not limited to, promissory notes, IOU notes and/or accounts receivable.

    i.    No documents produced.

g.    All contracts or agreements or documents memorializing contracts or agreements between you and Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

    i.    No documents produced.

h.    All documents memorializing communication by and between you and Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC relating to loans made by you to these persons or entities.

    i.    No documents produced.

i.    All documents memorializing any ownership interest you have in Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

    i.    No documents produced.

j.    All documents memorializing your ownership of any assets that are in the possession of Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

    i.    No documents produced.

k.    All documents memorializing any loan applications by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

    i.    No documents produced.

l.    All documents memorializing the financial condition of Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

    i.    No documents produced.

m.    All documents submitted by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC to convince you to loan any of them money in order for them to engage in a construction project.

    i.    No documents produced.

n.    All business proposals submitted to you by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

    i.    No documents produced.

14.    Additionally, Keith Young failed to provide Plaintiff's counsel with the sworn written Response to the Subpoena required by the Order.

15.    As a result of Keith Young's failure and refusal to produce the requested documents, Plaintiff is forced to file this Second Motion to Compel and for Sanctions Against Keith Young.

## II.  ARGUMENT & AUTHORITIES

16.    Pursuant to the Order:

If by January 3, 2018, Mr. Keith Young fails to produce the

documents required by this Order, or if by January 5, 2018, Mr. Keith Young fails to provide the sworn Response to the Subpoena required by this Order, then Mr. Keith Young is hereby ordered to pay the amount of $1,600 in attorney's fees and expenses to Plaintiff's counsel and will be in civil contempt of Court. In such event, Plaintiff will also be entitled to seek additional and further relief and sanctions from the Court against Mr. Keith Young.

[Adv. Doc. # 48]. As set forth above, Keith Young failed to produce the documents required by the Order and failed to provide the sworn Response to the Subpoena. Keith Young did not produce any documents in response to the majority of Plaintiff's Requests for Production. Keith Young did not produce his unredacted tax returns for inspection by the undersigned counsel and instead produced unsigned tax returns that were so heavily redacted that they were rendered useless.

17. Pursuant to the Court's Order, Keith Young is in contempt of this Court and must be compelled to pay the amount of $1,600 in attorney's fees and expenses to Plaintiff's counsel.

18. Pursuant to the Court's Order, Plaintiff now seeks additional sanctions against Keith Young for his willful failure to produce the documents requested. A court may impose sanctions under its inherent power on a person for conduct in bad faith, for willful disobedience of a court order, or for fraud on the Court. *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186, 197 L. Ed. 2d 585 (2017); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *Projects Mgmt. Co. v. DynCorp Int'l LLC*, 734 F.3d 366, 373 (4th Cir. 2013); *Sahyers v. Prugh, Holliday & Karatinos,*

*P.L.*, 560 F.3d 1241, 1245-46 & n.9 (11th Cir. 2009). Generally, "the proper remedy for contempt is the assessment of the damages caused by a [defendant's] actions, including attorney's fees." *In re All Trac Transp., Inc.*, 310 B.R. 570, 573 (Bankr. N.D. Tex. 2004)(citations omitted). "Attorney's fees may be awarded where court orders must be enforced by civil proceedings." *Id.* (*citing In re Hulon*, 92 B.R. 670, 676 (Bankr.N.D.Tex.1988).

19.  Keith Young has refused to comply with the Subpoena and the Order, is in contempt of this Court and is therefore properly subject to sanctions. Plaintiff requests that this Court issue an Order directing Keith Young to produce the documents requested within fourteen (14) days of the date of the order and sanctioning him in the amount of $2,200.00 for attorney's fees incurred by Plaintiff in preparing and filing this motion, and in attending a hearing on same.

20.  Additionally, this Court should be cognizant that this Motion for Sanctions is one of four that are to be filed in this bankruptcy and adversary against the Debtor, his father, Keith Young, and wife, Brittany Young. The Debtor, Brittany Young, and Keith Young, have all failed and refused to participate in discovery in this bankruptcy matter and in the related adversary proceedings. Pamela Young has been forced to file three Motions to Compel and for Sanctions against Debtor in the main bankruptcy case for Debtor's failure to produce documents under Rule 2004. Pamela Young has been forced to file two Motions to Compel and for Sanctions against the Debtor in

Adversary Proceeding No. 17-03010 for his failure to produce documents and respond to discovery. Pamela Young has been forced to file two Motions to Compel and for Sanctions against Brittany Young and two Motions to Compel and for Sanctions against Keith Young in Adversary Proceeding No. 17-03010 for their failure to respond to subpoenas duces tecum.

21. Bankruptcy relief is a privilege and the Debtor has "an affirmative duty . . . to provide books and records 'accurately documenting his financial affairs.'" *In re Hughes*, 354 B.R. 801, 809 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Hughes v. Neary*, 386 B.R. 624 (N.D. Tex. 2008), *aff'd sub nom. In re Hughes*, 309 Fed. Appx. 841 (5th Cir. 2009). Despite this duty, the Debtor and his family have engaged in a conspiracy to hide documents related to Debtor's financial affairs. Debtor and his family are making a mockery of the bankruptcy process and this Court and should be sanctioned appropriately.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Pamela Young requests that this Court enter an order:

a.      directing Keith Young to comply with the Order within 14 days;

b.      directing Keith Young to pay the sum of $1,600 to Plaintiff for failing to comply with the Order;

c.      directing Keith Young to pay the sum of $2,200.00 for reasonable attorney's fees and expenses incurred in bringing this Motion and attending hearing on

same; and,

d.      awarding Plaintiff such other relief as is just and equitable under the circumstances.

A copy of the proposed Order Granting Plaintiff's Second Motion to Compel and for Sanctions Against Keith Young is attached hereto as Exhibit P-8.

Respectfully submitted,

JAMES & HAUGLAND, P.C.
P.O. Box 1770
El Paso, Texas 79949-1770
Phone:  915-532-3911
FAX: (915) 541-6440


By: _____

Corey W. Haugland
State Bar No. 09234200
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I, Corey W. Haugland, hereby certify that on the _21st_ day of January, 2018 a true and correct copy of the foregoing Plaintiff's Second Motion to Compel and for Sanctions Against Keith Young was served on the following parties *via* electronic means as listed on the Court's ECF Noticing System:

Carlos A. Miranda, III
Miranda & Maldonado, P.C.
5915 Silver Springs, Bldg. 7
El Paso, TX 79912

and was served on the following via certified mail, return receipt requested:

Keith Young
4532 Rhea
El Paso, Texas 79924

Corey W. Haugland

Page 1

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

In re:                          )
                                )
TRAVIS RYAN YOUNG,              )  Case No. 17-30163-hcm
                                )
        Debtor.                 )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

TRAVIS RYAN YOUNG

APRIL 4, 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        The ORAL DEPOSITION of TRAVIS RYAN YOUNG,

produced as a witness at the instance of Pamela Young,

and duly sworn, was taken in the above-styled and

numbered cause on Tuesday, April 4, 2017, from 10:26

a.m. to 1:06 p.m., before Mary Procell, CSR in and for

the State of Texas, reported by machine shorthand, at

the offices of Associated Court Reporters, 221 North

Kansas, Suite 550, El Paso, Texas, pursuant to the

Federal Rules of Civil Procedure.

CERTIFIED: _____    PREPARED FOR: _____



EXHIBIT
P-1

## Page 2

APPEARANCES

FOR THE DEBTOR:
Mr. Michael R. Nevarez
The Law Offices of Michael R. Nevarez
P.O. Box 12247
El Paso, Texas 79913
FOR PAMELA YOUNG:
Mr. Corey W. Haugland
James & Haugland, P.C.
609 Montana Avenue
El Paso, Texas 79902
Also Present:
Pamela Young

INDEX

WITNESS:                                        Page
TRAVIS RYAN YOUNG
EXAMINATION BY MR. HAUGLAND          4

EXHIBITS
1  Notice of Intent to Conduct Rule 2004        5
   Examination Duces Tecum of Debtor,
   Travis Ryan Young
2  Premier Builders Inventory List             42
3  Voluntary Petition for Individuals          55
   Filing for Bankruptcy of Travis Ryan
   Young, 51pages
4  Statement of Financial Affairs for          55
   Individuals Filing for Bankruptcy for
   Travis Ryan Young
5  Amended Statement of Financial Affairs      56
   for Individuals Filing for Bankruptcy
   for Travis Ryan Young
6  Copy of check to FirstLight from            64
   Travis R. Young, dated 12/21/15
7  Copy of check to FirstLight from            64
   Travis R. Young, dated 1/15/16
8  Copy of check to Accurate Collision         64
   from Travis R. Young, dated 2/4/16

## Page 3

CERTIFICATION                    66
CHANGES AND SIGNATURE PAGE        67

## Page 4

TRAVIS RYAN YOUNG,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HAUGLAND:

Q. Please state your complete name for the record.

A. Travis Ryan Young.

Q. And where do you reside?

A. El Paso, Texas.

Q. What address?

A. 6647 Mariposa, El Paso, Texas 79912.

Q. And how long have you lived at that address?

A. About five years now.

Q. What is your date of birth?

A. 11/18/82.

Q. What is your Texas driver's license number?

A. I don't know it offhand. 17632530.

Q. Did I ask your date of birth?

A. Yes.

Q. Where were you born?

A. El Paso, Texas.

Q. And where were you raised?

A. El Paso, Texas.

Q. Where did you go to high school?

A. Cathedral High School.

## Page 5

Q. What year did you graduate?

A. 2001.

Q. Have you ever provided a deposition before?

A. No.

Q. You are doing well. You're answering my questions audibly, which helps the court reporter make a record. If you don't understand any of my questions, ask me to rephrase, and I'll be glad to do so. If you need to take a break for any reason, ask to take a break and you can do so.

We met yesterday in order for you to produce documents pursuant to a Notice of Intent to Conduct Rule 2004 Examination Duces Tecum, correct?

A. Yes.

(Exhibit marked, 1.)

Q. (BY MR. HAUGLAND) I'm going to hand both you and your attorney a copy of that notice, which we should mark as Exhibit 1.

I want to confirm those things that were produced by you yesterday, and I'll show it to you as we talk about them. The first file you produced was Bank of America check statements, correct?

A. Right.

Q. Is that for 2014 through 2016?

A. Yes.

## Page 6

1     Q. Was this a personal account or is this a
2 business account?
3     A. Those are personal accounts.
4     Q. During this time frame did you maintain a
5 separate checking account for the business?
6     A. In 2014 I had a separate account, the 8381,
7 which was a business one, but still under the sole
8 proprietorship.
9     Q. Do you have a college degree?
10     A. Yes.
11     Q. What degree do you have?
12     A. It's in civil engineering.
13     Q. Where did you obtain it?
14     A. New Mexico State University.
15     Q. When did you graduate?
16     A. 2006.
17     Q. After graduating who did you go to work for?
18     A. I worked for Dantex Construction.
19     Q. In what capacity?
20     A. I started as a manager there.
21     Q. Who was your immediate supervisor?
22     A. I think his name was Tom — I don't remember
23 his last name. Tom — I would have to think about that.
24     Q. How long did you work for Dantex?
25     A. About two years.

## Page 7

1     Q. And where did you go to work after that?
2     A. That's when I started the home building after
3 that.
4     Q. Did you build homes for Dantex?
5     A. No. Dantex was commercial.
6     Q. So you started home building in 2008; is that
7 right?
8     A. It was late 2008, early 2009, I believe.
9     Q. Did you do that in your individual name or did
10 you use a d/b/a?
11     A. It was Travis Ryan Young d/b/a Premier
12 Builders.
13     Q. Did you file an assumed name certificate with
14 the county clerk?
15     A. Uh-huh. Yes, I did.
16     Q. For whom did you build your first home?
17     A. It was -- well, it was a spec house, but then
18 the people that bought it were the Chaffees. Their last
19 name was Chaffee.
20     Q. What did the house sell for?
21     A. Around $300,000, I believe.
22     Q. Where did you get the financing to build a
23 spec house?
24     A. It was from my dad.
25     Q. What's your father's name?

## Page 8

1     A. Keith Young.
2     Q. Did you make a profit from that house?
3     A. I did.
4     Q. Approximately how much?
5     A. I would say like 40-, 45,000.
6     Q. When did you complete construction of that
7 house?
8     A. It was probably 2010. No -- yes, 2010.
9     Q. Did you start any new construction before you
10 finished that house, or did you wait until you finished
11 that house before starting something else?
12     A. Yes, I waited till that one was finished and
13 sold.
14     Q. With regard to the construction of the house,
15 what is it exactly that you do in building the houses
16 that you build?
17     A. I mean, I would do everything back then, do
18 the budget for it, run the -- get the subcontractors,
19 supervise, manage it.
20     Q. Where did you get your plans for building the
21 house?
22     A. From a drafter. And we designed it.
23     Q. Did you design the houses, or did someone else
24 design the houses?
25     A. I mean, they would be kind of my idea, but

## Page 9

1 they would -- of course, they are drafters, so they
2 would draw them on the AutoCAD.
3     Q. Who did you use to draw the plans for the
4 first house?
5     A. Who did that one? He was somebody that I
6 worked with at Dantex. I would have to look up his
7 name. I don't remember his name.
8     Q. What kind of subs did you have to hire to
9 build the house?
10     A. Each sub was specialized in their area:
11 Separate roof subcontractor, plumbing contractor,
12 et cetera.
13     Q. I guess what I'm trying to find out is, do you
14 build any part of the house yourself, with your own
15 hands?
16     A. I would do some work back then on my own,
17 finish work, tile work, but after that house I didn't.
18     Q. So how many subs would you have on the
19 construction of this house? You said roofing, plumbing.
20     A. Probably would be about 12 to 15.
21     Q. After completing this house in 2010, did you
22 start the construction of another house?
23     A. Yes, I did.
24     Q. For whom?
25     A. It was another spec house.

## Page 10

1     Q. Did you sell this house?

2     A. Uh-huh.

3     Q. To whom?

4     A. That one was to -- it was a realtor. Her name

5 was Linda.

6     Q. Can you remember her last name?

7     A. McDaniel.

8     Q. What was this house sold for?

9     A. I think 320-, I want to say.

10     Q. Did you make a profit on the sale?

11     A. That one -- as far as you mean profit after

12 tax, doing all the -- deducting costs?

13     Q. After all the costs.

14     A. That one, probably like 20,000.

15     Q. Just out of curiosity, what kind of profit

16 margin were you looking for out of the construction of

17 these homes?

18     A. I mean, that was during the bad economy time,

19 so I wasn't looking for a huge profit, but more than

20 that. But that house sat for about -- I don't know --

21 eight months while it was for sale.

22     Q. When did you complete the construction of the

23 property?

24     A. That one, I want to say 2011.

25     Q. Who provided the financing to build the house?

## Page 11

1     A. My father did.

2     Q. When did you start building the next house

3 that you built?

4     A. Everything -- every one was subsequent. So

5 after 2011 would be the following.

6     Q. Would you have built it before you sold the

7 house to Linda McDaniel, or would you have built it

8 after you completed the construction?

9     A. It was after.

10     Q. After it was sold?

11     A. Uh-huh, after it was sold.

12     Q. So did you start that house in 2012 or 2011?

13     A. It's hard to say. I'm not sure. Could have

14 been late 2011, early 2012.

15     Q. Whose home was this? Or was this another spec

16 house?

17     A. Yes. I was just building specs all then --

18 all at that time. I don't remember whose that one was.

19     Q. You don't recall who you sold it to?

20     A. Huh-uh.

21     Q. When did you finish construction?

22     MR. NEVAREZ: When you answer, say yes or

23 no.

24     THE WITNESS: Oh, sorry.

25     MR. NEVAREZ: Don't do huh-uh. That

## Page 12

1 doesn't show up.

2     A. Okay. Repeat, please.

3     Q. (BY MR. HAUGLAND) You can't remember who you

4 sold the house to?

5     A. No, I don't remember those folks.

6     Q. When was the next house that you built?

7     A. It was probably 2012 as well.

8     Q. Was this another spec house?

9     A. That one was a presale.

10     Q. To whom?

11     A. I remember their last name was Hollands.

12     Q. Can you remember where the house was located?

13     A. It was on Brays Landing.

14     Q. And how much did that house sell for?

15     A. It was about 320- as well.

16     Q. I didn't ask about the third house. Who

17 provided the financing to build the third house?

18     A. My father did.

19     Q. Who provided the financing to build this

20 fourth house for the Hollands?

21     A. My father.

22     Q. When did you get the Hollands' home finished?

23     A. 2012.

24     Q. Whose house did you build next?

25     A. I built a spec house after that again. Which

## Page 13

1 one was it? I think that was Franklin Trail.

2     Q. Was the house sold?

3     A. Uh-huh.

4     Q. To who?

5     A. It was sold to a doctor. I think his last

6 name was Kidd.

7     Q. Can you remember the sales price?

8     A. That one was 415-.

9     Q. Did you make a profit on it?

10     A. I made probably -- after all the costs and

11 everything, it was probably like 35,000.

12     Q. Who provided the financing for building that

13 house?

14     A. My father.

15     Q. When was that house completed?

16     A. 2013.

17     Q. What was the next house that you built?

18     A. I built one for -- the next one was Calle

19 Alta.

20     Q. How do you spell that?

21     A. C-A-L-L-E, and another separate word, A-L-T-A.

22     Q. And for whom did you build this home?

23     A. That was for the Rioses.

24     Q. What did it sell for?

25     A. That was their own land, and they financed

## Page 14

1   that one. So there really wasn't a sales price. Well,
2   I think I charged them like 380,000, because they
3   already had the land.
4   Q. Did you make a profit on it?
5   A. Probably about 35,000 or so.
6   Q. And who financed -- they financed this one?
7   A. Uh-huh.
8   Q. When was this house completed?
9   A. 2013.
10   Q. Were you getting faster at building homes, or
11   were you starting to build them simultaneously?
12   A. I mean, my dad was limited to what he was
13   giving out, so that's why -- I was building Franklin
14   Trail and then Calle Alta at the same time, because
15   they -- I mean the owners were financing it. That's
16   usually how presales go. The owners are supposed to
17   finance them.
18   Q. What was the next house you built after the
19   Calle Alta?
20   A. That was hers (indicating).
21   Q. Pam Young's?
22   A. Your client's, yes.
23   Q. And who financed the construction of that
24   house?
25   A. My father did.

## Page 15

1   Q. And what was the sales price of that house?
2   A. 536-.
3   Q. Did you make a profit on that house?
4   A. Not really.
5   Q. Was this the first home you constructed that
6   you didn't make a profit?
7   A. That probably was, yes. That's when it
8   started.
9   Q. Who designed the plans for the house?
10   A. That house was -- his name was Rafcad.
11   Q. How do you spell that?
12   A. R-A-F-C-A-D.
13   Q. Does that person live in El Paso?
14   A. Yes, he does.
15   Q. Is he an architect?
16   A. He is a drafter.
17   Q. Is he independent or does he work for someone?
18   A. No. He is independent.
19   Q. What was the next house that you built?
20   A. At that time I was doing Silver Star and
21   Montoya Oak at the same time.
22   Q. Have those been completed?
23   A. Uh-huh. Yes, they have.
24   Q. First of all, when was Pam Young's house
25   completed?

## Page 16

1   A. It was in 2014.
2   Q. When was Silver Star completed?
3   A. It was completed in 2- -- at the end of 2015,
4   and it was sold in 2016. Silver Star was a spec house.
5   Q. What did Silver Star sell for?
6   A. 675-.
7   Q. Did you make a profit?
8   A. No.
9   Q. Montoya Oak, when did you complete it?
10   A. That was completed in 2015.
11   Q. When was it sold?
12   A. It was 2015 as well. The owners had owned the
13   lot, and my father had financed them, so it was kind
14   of a presale/spec built -- well, it was an awkward
15   situation.
16   Q. Who were the buyers?
17   A. The people who owned that lot were -- it was
18   Rebecca Wisbrun. She is also known by six names. I'm
19   not sure all of them. She is R.W. Schwartz.
20   Q. Rebecca Reza?
21   A. Yes. She is known by Rebecca Reza, Rebecca
22   Wisbrun, R.W. Schwartz. I don't know her other ones.
23   Q. Do you know why she has so many names?
24   A. I don't think they are the most ethical of
25   people.

## Page 17

1   Q. What did that house sell for?
2   A. That one, the contract was for 408,000. That
3   was with the pool.
4   Q. Did you realize a profit on this property?
5   A. No, I didn't.
6   Q. Did you make a profit on -- you didn't make a
7   profit on Silver Star either?
8   A. Huh-uh.
9   Q. Who financed Silver Star?
10   A. Well, that was a mix of my father and those
11   Jet loans. And I had those properties so long that the
12   Jet loans got very expensive.
13   Q. And who financed Montoya Oak?
14   A. My father did that one.
15   Q. After Montoya Oak, what was the next property
16   you built?
17   A. Well, Silver Star was really after Montoya
18   Oak, and Silver Star was my last one.
19   Q. So you haven't been employed since the end of
20   2015?
21   A. Well, I sold it the beginning of 2016, that
22   Silver Star house. And, yes, that's -- that was the end
23   of the d/b/a.
24   Q. Did you go to work for somebody else at that
25   point in time?

## Page 18

1    A.  No.  Well --
2    Q.  2016.
3    A.  I didn't know what I was going to do for a few
4  months, and that's when my wife opened her company.
5    Q.  What's your wife's name?
6    A.  Brittany Young.
7    Q.  What's her maiden name?
8    A.  Jackson.
9    Q.  And when did you get married?
10   A.  It was in 2014.
11   Q.  Do you know the date?
12   A.  August.
13   Q.  August what?
14   A.  The end of August, I believe.  August 23 or
15  24.
16   Q.  Of 2014?
17   A.  Uh-huh.
18   Q.  Is your wife from El Paso?
19   A.  She is from Las Cruces.
20   Q.  Does she have a degree?
21   A.  Yes, she does.
22   Q.  What is her educational background?
23   A.  It's in -- she got her first degree in
24  communications, and then she got a secondary degree in
25  education.

## Page 19

1    Q.  At New Mexico State?
2    A.  Yes.
3    Q.  Is that where you met her?
4    A.  I met her down here, actually.
5    Q.  Do you have any children?
6    A.  We just had one child.
7    Q.  How old is the baby?
8    A.  She is seven months now.
9    Q.  Is your wife employed?
10   A.  No.
11   Q.  Has she ever been employed while you have been
12  married to her?
13   A.  Through EPISD.
14   Q.  When did she work for the school district?
15   A.  She worked 2015 and part of 2016.
16   Q.  Has she not worked since she had the baby?
17   A.  Yes.
18   Q.  You sound better today.
19   A.  A little bit.
20   Q.  Are you still getting over --
21   A.  I had my cold and then I got better, and then
22  I got it again.
23   Q.  You sound a little better today than you did
24  yesterday.
25        Now let's talk about the document

## Page 20

1  production, because we are kind of at that point.  The
2  first category of documents that we requested were those
3  "documents relating to savings bank books, records,
4  accounts and memoranda, current as well as those that
5  may have been canceled, whether in your name or your
6  spouse's name, individually or jointly, or in connection
7  with any other person or persons."  We asked for these
8  records for January 1, 2013 through January 31, 2017.
9        And the first file of documents that you
10  provided were from December 25, 2013 through January 26,
11  2015, your Bank of America account in your name of
12  Travis R. Young; is that correct?
13   A.  Yes.
14   Q.  The address for the bank statements is 4532
15  Rhea, R-H-E-A, Lane, El Paso, Texas 79924-1746.  For
16  what period of time did you live at that address?
17   A.  That account was like about nine years old,
18  and so it was just always my parents' address.  I never
19  changed it.
20   Q.  So that's your parents' address?
21   A.  Uh-huh.  Yes.
22   Q.  And did you ever use the bank account as a
23  business account for your d/b/a Premier Builders?
24   A.  It was.
25   Q.  For what period of time?

## Page 21

1    A.  The time before I opened the other -- 8381.
2    Q.  That's likewise a Bank of America account,
3  correct?
4    A.  Yes.
5    Q.  And it appears that this account, the
6  documents produced are for March 1, 2014 --
7    A.  Yes.  That's when it was opened.
8    Q.  -- through December 31, 2014.  Does that sound
9  about right?
10   A.  No.  It should be up to the 2017.  Oh, yes.
11  That was one of the --
12   Q.  Let me hand you the file.
13   A.  Okay.  This one is 2014.  The other ones are
14  2015 and 2016.
15   Q.  Okay.
16   A.  So this was just 2014.
17   Q.  This is just 2014?
18   A.  Uh-huh.
19   Q.  Is this just 2015 in this file?
20   A.  Uh-huh.  Yes.
21   Q.  And then --
22   A.  Yes, 2016.
23   Q.  This Bank of America statement that you have
24  listed as Travis R. Young, Sole Prop -- or sole
25  proprietor, d/b/a Premier Builders, was this just a

## Page 22

1  business account?
2      A.  No.  I mean, since I was sole proprietor, I
3  used it for both purposes.
4      Q.  And this one came to 6647 Mariposa Drive?
5      A.  Right.
6      Q.  And that's your -- is that your homestead?
7      A.  Yes.
8      Q.  And you have lived there since when?
9      A.  Early 2011.
10     Q.  The account appears to have been closed in
11 June of 2016; is that right?
12     A.  Which account?  The 8381?
13     Q.  The 8381 account at Bank of America.
14     A.  No.  It's still open, I mean to this day.
15 It's just not being utilized.
16     Q.  Do you not have any bank statements after June
17 of 2016?
18     A.  I did.  I figured they were to 2017 in there.
19     Q.  That's when they end, is in June of 2016.
20     A.  I had these printed at Office Depot, and maybe
21 they didn't get the rest.
22     Q.  If you would check on that, I would appreciate
23 it.
24     A.  I will.
25     Q.  So you have not closed the account?

## Page 23

1      A.  No.
2      Q.  Have you turned those bank statements over to
3  the Chapter 7 trustee, Mr. Ingalls?
4      A.  Yes, up till the date I filed, and the
5  previous six months from then.  And I'm pretty sure
6  Cheryl put them in with the filing.
7      Q.  Since opening the sole proprietorship account
8  in 2014, have you maintained any other bank accounts?
9      A.  I still kept the personal one, but I didn't
10 use it all that much.
11     Q.  Is that the first one we saw --
12     A.  Yes.
13     Q.  -- the --
14         And is it still open also?
15     A.  No.  Those ones are closed.
16     Q.  The personal account is closed?
17     A.  Yes.
18     Q.  When did you close them?
19     A.  They closed them because there was no
20 activity.  So it was probably -- I think the last
21 statement is close to when it was closed, the last month
22 in there.
23     Q.  The one that you produced?
24     A.  Uh-huh.
25     Q.  Has your wife maintained a separate bank

## Page 24

1  account during the time that you have been married?
2      A.  Yes, she has.
3      Q.  Have you produced the statements for that
4  account?
5      A.  For the bankruptcy.
6      Q.  For the 2004 examination.
7      A.  Oh, no.
8      Q.  Why not?
9      A.  Because those are her separate accounts that
10 she has had.
11     Q.  Have you and your wife ever entered into a
12 premarital agreement to keep your assets separate during
13 your marriage?
14     A.  We have had a marital agreement that her
15 accounts would be the same and --
16     Q.  Is there a written agreement?
17     A.  Yes.
18     Q.  There's a written premarital agreement?
19     A.  Not premarital, just a marital agreement.
20     Q.  And it's in writing?
21     A.  Uh-huh.  Yes.
22     Q.  Who prepared it?
23     A.  Her and I did.
24     Q.  When was it prepared?
25     A.  I would say about two years ago.

## Page 25

1      Q.  What are the key terms of that written marital
2  agreement with Brittany?
3      A.  Just that her bank statement -- her bank
4  accounts stay hers, her income that she would make would
5  stay hers, and mine would stay mine.
6      Q.  Do you have a mortgage on your homestead?
7      A.  There is a mortgage.
8      Q.  Who is it with?
9      A.  It's with Kathleen Hernandez.  That's a
10 wraparound deed, so the main mortgage holder is still a
11 bank called Colonial Savings.
12     Q.  Who makes the mortgage payments every month?
13     A.  I pay directly to Colonial Savings.
14     Q.  The written marital agreement with your wife,
15 does it have any other terms besides keeping the bank
16 accounts separate and having the income stay separate?
17     A.  I mean those are the main terms of it.
18     Q.  Have you attempted, at the end of any year, to
19 divide your property with your wife, as to who and what
20 belongs to whom?
21     A.  No, never.
22     Q.  Have you ever had a bank account in the name
23 of Bay Homes?
24     A.  No.  Bay Homes was never a sole
25 proprietorship.

## Page 26

1    Q. What was Bay Homes?

2    A. Bay Homes is a d/b/a of my wife's LLC.

3    Q. What LLCs does your wife own?

4    A. Premier Builders & Design, LLC and RUF

5 Developers, LLC.

6    Q. And Bay Homes is a d/b/a for which?

7    A. Premier Builders & Design, LLC.

8    Q. Since 2016 have you worked for your wife's

9 LLCs in building homes?

10    A. Yes.

11    Q. When did you go to work for Premier Builders &

12 Design, LLC?

13    A. It was about April -- no -- March of 2016.

14    Q. How many homes has Premier Builders & Design,

15 LLC built since you went to work for it in March 2016?

16    A. From ground up, they are still just doing one.

17    Q. And when did you go to work for RUF Builders,

18 LLC?

19    A. RUF is just -- they just own a lot. It hasn't

20 been organized, really. I mean, it hasn't been -- it

21 hasn't had any assets, really, beside just owning a lot.

22    Q. The Premier Builders house that's being built,

23 is that a presale or is that a spec house?

24    A. It's a spec.

25    Q. Where is it located?

## Page 27

1    A. It's on 354 Rocky Point.

2    Q. Who is providing the financing for it?

3    A. My father is.

4    Q. What's your projected sales price for this

5 house?

6    A. It's hard to say. It's a difficult area.

7 Right now it's listed at 898-, but it could go for 800-.

8    Q. Do you know what costs you have in that

9 property?

10    A. No, I don't.

11    Q. What has been your job title and

12 responsibilities for Premier Builders & Design, LLC with

13 regard to the construction of the Rocky Point house?

14    A. Just managing the build aspects of it.

15    Q. What has your wife done for Premier Builders &

16 Design, LLC with regard to the construction of 354 Rocky

17 Point?

18    A. She retains the contracts for the

19 subcontractors. She does the accounting. She does -- I

20 mean, she does the business side of it, makes the phone

21 calls to the City, makes phone calls.

22    Q. What's your salary with Premier Builders &

23 Design?

24    A. We haven't come to an agreement yet, since it

25 hasn't had any income from the build.

## Page 28

1    Q. Do you have a salary with RUF Builders, LLC?

2    A. No.

3    Q. Do you have an agreement concerning a salary

4 that you will get in RUF Builders, LLC?

5    A. No.

6    Q. Does your wife get a salary in Premier

7 Builders & Design, LLC?

8    A. No, she doesn't.

9    Q. With regard to your d/b/a Premier Builders,

10 did you have a salary with Premier Builders?

11    A. No, I never did. Since most of the houses

12 were spec homes, I had to wait until they were sold.

13    Q. Did your wife have a salary with the d/b/a

14 Premier Builders?

15    A. No, she didn't.

16    Q. Did your wife ever perform services for

17 Premier Builders?

18    A. No.

19    Q. When your father was financing the properties

20 for Premier Builders, what terms was he giving you for

21 the financing?

22    A. I mean before I ran into all the problems with

23 her (indicating) -- I mean, he was helping me get

24 started with the business, so he would take just like

25 10,000. But he didn't even take an interest in --

## Page 29

1 interest on hers.

2    Q. So he wouldn't provide conventional financing

3 where he charged interest on the money loaned. He was

4 just taking a set fee of $10,000 per loan?

5    A. Once I finished he would say, Okay. What did

6 you make on it? And then -- but the whole time he was

7 mainly doing it, helping me get started with the

8 business.

9    Q. So would it be fair to say that you would come

10 to an agreement on what you would pay him back after you

11 got the house built and sold?

12    A. For the most part, yes.

13    Q. When the financing was being provided, were

14 you documenting the loan in any way?

15    A. I would put -- before hers I would just put it

16 on my spreadsheet, what I would put into it, into each

17 build. Then once it sold we would go over it. So we

18 never filed deeds or anything.

19    Q. Well, you wouldn't file a deed of trust?

20    A. Right.

21    Q. Would you ever sign a note?

22    A. No.

23    Q. So the last property that you did under your

24 d/b/a was Silver Star, correct?

25    A. Yes.

## Page 30

1  Q. And that was financed by your father?
2  A. Correct.
3  Q. And was your father paid in full for --
4  A. Yes.
5  Q. -- his loan on that property?
6  A. Yes, it was, because that's when I split the
7  Jet loan to part of it, and then he financed part of it.
8  Q. Was the Jet loan paid in full?
9  A. Yes.
10  Q. And I think you indicated that the next
11  property you built was the one for your wife's company,
12  Premier Builders, LLC?
13  A. Right.
14  Q. And your father is providing the financing on
15  that property?
16  A. Yes, he is. It also has another lien from the
17  developer.
18  Q. Who is the developer?
19  A. High Mountain. High Mountain, Limited.
20  Q. Who is the person behind High Mountain,
21  Limited?
22  A. It's Richard Thomas.
23  Q. How much is his lien?
24  A. It's 100,000, I believe.
25  Q. Have you personally guaranteed that lien?

## Page 31

1  A. No. I mean, I don't know if my wife has. I
2  don't believe she did.
3  Q. So there's no personal guarantees on the loan
4  by Richard Thomas to Premier Builders & Design, LLC?
5  A. No.
6  Q. Is there a promissory note?
7  A. Yes, there is.
8  Q. Is there a deed of trust?
9  A. Yes.
10  Q. Is the loan for the purchase of the lot?
11  A. Yes.
12  Q. The financing that's been provided by your
13  father, is there a promissory note?
14  A. Yes, there is.
15  Q. Is there a deed of trust?
16  A. Yes.
17  Q. Is there an interest rate called for in the
18  promissory note with your father?
19  A. I would have to verify if it did. One of my
20  old attorneys did that paperwork.
21  Q. Who was that, the attorney?
22  A. It was Kirk.
23  Q. Bud Kirk?
24  A. Uh-huh.
25  Q. Have you done any other work since the first

## Page 32

1  part of 2016, other than build the house with Premier
2  Builders & Design, LLC?
3  A. We did a little renovation in Las Cruces for
4  her friend -- her friend's dad who passed away.
5  Q. Did the friend pass away or the friend's --
6  A. The friend's father.
7  Q. What's the friend's name?
8  A. It was Darby Snow.
9  Q. Was there a contract for this work?
10  A. Well, the father died and they were trying
11  to -- they couldn't find anybody to sell the house
12  because it was like a hoarder house, and so they asked
13  us -- they asked my wife if she wanted to buy it.
14  Q. They --
15  A. They were almost going to condemn it, the
16  City, and the wife couldn't afford to have two house
17  payments.
18  Q. The wife -- whose wife?
19  A. The wife of the guy who passed away.
20  Q. She had two house payments?
21  A. Well, his -- because they were living
22  separate. And so when he passed away she couldn't keep
23  that house afloat and her own personal residence.
24  Q. So was the house deeded to your wife?
25  A. It was deeded to the LLC.

## Page 33

1  Q. Which LLC?
2  A. Premier Builders & Design, LLC.
3  Q. So what work had been done on this house since
4  it was deeded to Premier Builders & Design?
5  A. It was remodeled and sold.
6  Q. What repairs were done to this house?
7  A. It was extensive. The whole back part of the
8  house had to come off. Roof redone, electrical,
9  plumbing, kitchen, all new tile, carpet, garage doors,
10  new doors. It was a lot of work.
11  Q. And when did you do this work?
12  A. In March or April of -- no -- April of 2014 --
13  2016. April and May, I believe.
14  Q. And when was it sold?
15  A. In June.
16  Q. Of 2016?
17  A. Yes.
18  Q. How much was it sold for?
19  A. 130-, I want to say.
20  Q. What was the property acquired for? What was
21  your purchase price?
22  A. 89-, I believe.
23  Q. How much money was put into the house to fix
24  it up?
25  A. I don't know offhand. I would have to see.

## Page 34

1  Like I said, we haven't done the taxes this year so --
2  or she hasn't done the taxes.
3  Q.  Did you make money on the property?
4  A.  No, because we were just helping a friend.  I
5  mean after all the costs, just driving up there --
6  Q.  So was this job done before you started
7  building the house at 354 Rocky Point?
8  A.  Yes.
9  Q.  Who funded the remodeling job in Las Cruces?
10  A.  My father did.
11  Q.  What interest or profit did your father take
12  on this job?
13  A.  There wasn't much to be taken, so I think he
14  only took like 1,000.  First we bought it just to
15  wholesale it, but nobody wanted it because it was in too
16  bad a condition.
17  MR. NEVAREZ:  Is this a good time to
18  break?
19  MR. HAUGLAND:  Sure, we can take a break.
20  (A break taken, 11:26 to 11:38.)
21  Q.  (BY MR. HAUGLAND)  Let's talk about some of the
22  production of documents in this matter.  We asked you to
23  provide a ledger for Premier Builders, the d/b/a.
24  A.  Uh-huh.
25  Q.  Let me hand you a file.  Is that what those

## Page 35

1  documents are there?  Is that the ledger that you
2  prepared for Premier Builders?
3  A.  Yes.
4  Q.  And I numbered the documents you produced
5  yesterday in my office, so that ledger starts at Travis
6  00435 and goes through Travis 00453; is that right?
7  A.  Yes.
8  Q.  How would you know what entries to put in the
9  ledger as compared to the checks that were written on
10  the account during that time frame?
11  A.  When I would write a check I would put it on
12  there, if that's what you are asking.
13  Q.  Would you have every check in the account on
14  your ledger?
15  A.  Well, they should be, yes.  Yes.
16  Q.  Would there ever be checks written out of the
17  account that would not end up on the ledger?
18  A.  No.
19  Q.  The checks that were produced in response to
20  the request for production, are these all out of one
21  account, or are they mixed together between the accounts
22  that you had during this time frame?
23  A.  That's just one account, the 8381.
24  Q.  And is that the same account that was used to
25  create the ledger for the business?

## Page 36

1  A.  Yes.
2  Q.  Have you ever had a savings account?
3  A.  It was just that personal one, with the
4  personal documents, but no money was really kept in it.
5  Q.  Is it Bank of America?
6  A.  Yes.
7  Q.  Have you ever had a retirement account?
8  A.  No.
9  Q.  Have you ever had a stock brokerage account?
10  A.  No.
11  Q.  Let's talk about the tax returns that have
12  been produced.
13  A.  There's one more in here, too.
14  Q.  All right.
15  A.  That's the other part of 2015 and then 2013.
16  Q.  So in 2013 -- where were you living in 2013?
17  A.  At the Mariposa house.
18  Q.  And your income is reflected as $28,190 in
19  2013.  And that's self-employment income from operation
20  of your business?
21  A.  Correct.
22  Q.  And in 2014 where were you living?
23  A.  The Mariposa house.
24  Q.  And your business income is claimed at
25  $21,500; is that correct?  Do you want to see?

## Page 37

1  A.  Yes, let me see.  Yes.  But I had to -- I
2  think I amended the 2015 one.
3  Q.  This is 2014.
4  A.  Right.
5  Q.  You think you amended 2014?
6  A.  Because I didn't put the interest on the Jet
7  loan in 2014, so I carried it over to the 2015.  So it
8  should have been 2014, but in 2015 I didn't use the
9  accountant to do it.
10  Q.  So in 2015 did you prepare your tax return
11  yourself?
12  A.  Yes.
13  Q.  And this is the one you think you have had to
14  amend?
15  A.  Yes.
16  Q.  Did you use the same accountant to do the
17  amended return, Vargas CPA, PC?
18  A.  Not in 2015.  I mean -- yes, not in 2015 --
19  Q.  Who did you use?
20  A.  -- return.
21  I didn't use anybody.
22  Q.  Who did the amended return?
23  A.  No, no, no.  I was saying that the costs from
24  2014, we didn't put the interest on, so I put them on
25  the 2015 one.

## Page 38

1  Q. So in 2015 was your claimed business income
2  $3,835?
3  A. Yes.
4  Q. But your sales for 2015 in Premier Builders
5  was $388,500?
6  A. Right.
7  Q. In 2016 do you have any idea what your income
8  was?
9  A. It was on the bottom of the other summary, 356
10  Silver Star. I think it was under the financial
11  statements folder. I'm not sure offhand. It was at the
12  bottom of it.
13  Q. Let me hand you the Silver Star documentation
14  you are referencing.
15  A. So Silver Star, the net profit, I mean without
16  doing tax deductions, was 10,000.
17  Q. $10,108.27?
18  A. Yes.
19  Q. That's your earned income for calendar year
20  2016?
21  A. Right.
22  Q. Will you be preparing your 2016 tax return for
23  filing on or before April 15 of this year?
24  A. I probably will.
25  Q. Are you going to do it yourself, or are you

## Page 39

1  going to ask for assistance?
2  A. I will probably have assistance, just to make
3  sure.
4  Q. Are you using Vargas?
5  A. No, I'm not.
6  Q. Why not?
7  A. The girl who I used to work with under him,
8  she left his office, so I don't use him anymore.
9  Q. Who is the person you use?
10  A. Her name was Tammy, I believe. Tammy -- I
11  would have to get it for you. She actually left in
12  2014, and that's why I didn't do 2015 there. Or she
13  left sometime during that time.
14  Q. With regard to the request for production on
15  deeds and conveyances of real property in your name or
16  your spouse's name, I'm going to hand you the file that
17  includes the deeds that you provided here, and I would
18  like you to identify the properties that have been
19  deeded into your name in the last five years that you
20  have produced here.
21  A. This is 356 Silver Star. This was her
22  (indicating) property.
23  Q. Whose property?
24  A. Pam's.
25  This was my personal residence.

## Page 40

1  Q. Okay.
2  A. Personal residence. The Franklin Trail. This
3  was the Silver Star, which I was financing, and the
4  Silver Star financing, and Silver Star transfer of deed.
5  And this is just mortgage information.
6  Q. The Colonial information is mortgage for what?
7  A. My property.
8  Q. Your home?
9  A. Uh-huh.
10  Q. Do you have the closing documents from the
11  various sales that you have closed through Premier
12  Builders since 2013?
13  A. I do have them.
14  Q. Are they maintained with the cost documents
15  related to the construction of the homes?
16  A. Yes.
17  Q. With regard to contracts relating to the sales
18  of properties, you produced the one contract between
19  Travis Young d/b/a Premier Builders and Jesus and
20  Rebecca Reza. Have you produced some more?
21  A. This is the Silver Star one. And then I
22  didn't know if you needed hers or not.
23  Q. With regard to the Silver Star contract that
24  you have handed me, who prepared the original of this
25  contract?

## Page 41

1  A. The other party, Sandy Messer organized it.
2  Q. What title company did you use to close this?
3  A. That one was Lone Star.
4  Q. Can you remember who the closer was on the
5  deal?
6  A. Yes. It's Tim Wieland.
7  Q. With regard to the financial statements that
8  you have produced, can you tell me what it is that these
9  three documents represent -- or these three groups of
10  documents that you have provided to me that relate to
11  financial statements?
12  A. This was my cost breakdown per job, and then,
13  I mean, I guess I had a simple way of accounting. And
14  so just the final costs, what the total build costs were
15  and then what I sold it for.
16  Q. And these are basically the job summaries or
17  the cost accounting on 448 San Clemente, Montoya Oak and
18  Silver Star?
19  A. Right.
20  Q. Is that right?
21  A. Uh-huh.
22  Q. Did you ever prepare a financial statement for
23  Premier Builders that included assets, liabilities and
24  owner's equity?
25  A. No, I never did.

## Page 42

1  Q. Did you ever have an accountant do that for
2  you?
3  A. No.
4  Q. Did Premier Builders ever own any personal
5  property?
6  A. As far as --
7  Q. Tools.
8  A. I did give you my tool inventory. I never
9  really had many tools, but I guess my truck would be the
10  only thing, if that's -- well --
11  (Exhibit marked, 2.)
12  Q. (BY MR. HAUGLAND) Why don't we go ahead and
13  mark this -- we have got Exhibit 1, so let's go to
14  Exhibit 2, because this is kind of --
15  A. The vehicle mileage were on there.
16  Q. That's the Premier Builders Inventory List
17  that you prepared and provided to me today?
18  A. Correct.
19  Q. And what all do you have on there?
20  A. It's just --
21  MR. NEVAREZ: Do you have another copy of
22  that for me?
23  MR. HAUGLAND: He brought this.
24  MR. NEVAREZ: Yes, I know. Since you
25  entered it into an exhibit, I would like to have a copy.

## Page 43

1  MR. HAUGLAND: Well, I mean, can we wait
2  till we ask questions about it and make a copy on the
3  break?
4  MR. NEVAREZ: Well, I kind of would like
5  to follow along. I can't see from here.
6  MR. HAUGLAND: Well, your client brought
7  it. If you want to break so we can make a copy of it
8  before I ask questions, I guess we can.
9  MR. NEVAREZ: Well, go ahead, since it's
10  just a small document. Are there going to be other
11  documents that you are going to be entering into
12  exhibits?
13  MR. HAUGLAND: The ones that I brought
14  with me I have extra copies for you. I'm not planning
15  on necessarily making exhibits of all the documents at
16  this point. But this one I didn't -- since it's a
17  single page, I was afraid it was going to get lost.
18  MR. NEVAREZ: Okay. Go ahead.
19  Q. (BY MR. HAUGLAND) What all did you include as
20  business assets of Premier Builders?
21  A. Just some small value tools and my truck, and
22  then I just put the vehicle mileage on the sheet.
23  Q. You also have an "Audi Q5 Milage." Who does
24  the Audi belong to?
25  A. That's my wife's.

## Page 44

1  Q. And what's the Infinity G37?
2  A. That's hers, too. I mean her car.
3  Q. And so the 2008 F-250, is that your car?
4  A. Uh-huh.
5  Q. Do you have any other vehicles that you and
6  your wife own?
7  A. No.
8  Q. With regard to documents related to financing
9  of your business, would it be fair to say that these two
10  Uniform Residential Loan Application groups of documents
11  represent the totality of the loan documentation in your
12  possession relating to Premier Builders?
13  A. Yes, it is.
14  Q. What two jobs did these relate to, if you can
15  tell me?
16  A. They were both for Silver Star. Yes, they
17  were both for Silver Star.
18  Q. And who was the lender?
19  A. The broker was Marquise Lending. The actual
20  lender was Jet Private Loans.
21  Q. Do you know the person behind Jet Private
22  Loans?
23  A. No, I don't. I never met him.
24  Q. Did you ever make a loan application to Binary
25  Investments?

## Page 45

1  A. Yes. Actually one of those was, I think, an
2  application. It didn't go through. I mean, we never
3  consummated the deal. But the Jet loan did.
4  Q. Why didn't the Binary Investments loan go
5  through?
6  A. Right when I was doing that loan, that's when
7  I sold the property.
8  Q. Is that the Silver Star property?
9  A. Yes.
10  Q. How much were you going to borrow from Binary?
11  A. It was 350-. It was mainly to pay off the Jet
12  loans.
13  Q. Was there more than one Jet loan?
14  A. There were two Jet loans on the Silver Star
15  for 250-.
16  Q. What was going to be done with the extra
17  $100,000 you were borrowing from Binary?
18  A. Well, at that time I still -- finishing the
19  house, so I was going to use it for construction. But I
20  had still owed money to Jet loans. I don't remember
21  exactly how much. So it wasn't going to come out to
22  that much that they were going to end up giving out of
23  that 350-.
24  Q. We were talking about cars and trucks. Do the
25  LLCs that are owned by your wife own any cars or trucks?

## Page 46

1    A.  No.
2    Q.  The cars and truck titles, are those what you
3  brought me here today?
4    A.  Yes.  That one is my Ford, and then that one
5  in the Infinity.
6    Q.  Do you not have the title for the Audi Q5?
7    A.  No, because that one is financed.  The
8  Infinity was totaled and we bought it back and I
9  repaired it.
10   Q.  What other documents have you produced today?
11   A.  Just insurance documents of the vehicles.
12   Q.  Have you produced your homeowner's insurance
13  policy?
14   A.  No.  I need to ask Kathleen Hernandez what's
15  on it right now.
16   Q.  Who did you buy the insurance for your
17  homeowner's through?
18   A.  I never purchased it.  She said she has just
19  had the same insurance on the property since -- it's
20  been a while now, six years.  So I need to find out.
21   Q.  So who has the insurance?
22   A.  I believe it's still in her name through
23  her -- that her lender makes her have, the Colonial
24  Savings.
25   Q.  That's Kathryn [sic] Hernandez?

## Page 47

1    A.  Uh-huh.
2    Q.  She is your lender?
3    A.  Right.
4    Q.  She was the seller, and she let you wrap her
5  original mortgage?
6    A.  Correct.
7    Q.  Other than your Texas driver's license, do you
8  have any other licenses?
9    A.  No, I don't.
10   Q.  Do you have any memberships in any other
11  organizations or associations?
12   A.  No.
13   Q.  During the last four years, have you or your
14  wife spent more than $500 in acquiring any personal
15  property?
16   A.  The only ones I can think of is a new bed, new
17  mattress.  I really didn't buy many items, nor did she.
18   Q.  Who did you buy the bed and mattress from?
19   A.  Mattress firm, I think.  I'm not sure.
20   Q.  Would you have spent more than $500 in any one
21  expenditure with Amazon.com?
22   A.  A lot of times the Amazon was for building
23  supplies.
24   Q.  What monthly credit cards -- strike that.
25        What cards have you used over the last

## Page 48

1  four years?
2    A.  The Chase business one -- Chase, Inc., I mean.
3  There was a Capital One.  The Capital One was a business
4  one.  And there was a Bank of America personal, and the
5  Citi card that was -- well, the City card was business
6  too.
7    Q.  So --
8    A.  And a Chase -- there's another Chase
9  Southwest.
10   Q.  So you have a Chase -- what -- MasterCard?
11   A.  It was Chase, Inc. Visa.  Yes, it was a Visa.
12   Q.  And then you have a Capital One?
13   A.  Uh-huh.  Yes.
14   Q.  And you have a Citi card?
15   A.  Yes.
16   Q.  And you have a Chase Southwest?
17   A.  Yes.
18   Q.  You did not produce those statements.  Do you
19  have access to those statements?
20   A.  I could probably get them.  Since they were
21  closed, I don't know how difficult that is.
22   Q.  You didn't keep the statements?
23   A.  I do have some of them.
24   Q.  I would still like to see them.
25   A.  Like I said, the main one I used was the

## Page 49

1  Chase, Inc. card.  Of course, because I was getting
2  points at that time.  But it was a paid-in-full-monthly
3  card.
4    Q.  So is it fair to say that none of the
5  agreements between you and your father have ever been in
6  writing?
7    A.  Correct.
8    Q.  And I asked you to provide the checking
9  account statements for your wife.  Why have you not
10  produced those today or yesterday?
11   A.  The same reason, just because it was her
12  separate property.
13   Q.  I asked you to produce all form 940's and form
14  941's prepared for Premier Builders.  And I think you
15  indicated yesterday you have never prepared those; is
16  that right?
17   A.  Correct.
18   Q.  And that's because you have never had any
19  employees?
20   A.  Right.
21   Q.  Do either of the LLCs that you are currently
22  working for have any employees besides yourself?
23   A.  No.
24   Q.  I asked you to produce your wife's Texas
25  driver's license and Social Security card.  You have not

## Page 50

1 done that, have you?
2     A. No.
3     Q. Why not?
4     A. Mainly a privacy thing, too.
5     Q. Does she have a Texas driver's license or a
6 New Mexico driver's license?
7     A. I don't know. I think she switched it to
8 Texas.
9     Q. And you have indicated that your homeowner's
10 insurance policy -- you don't have a copy of it?
11     A. No. I need to do some research into that.
12     Q. Do the LLCs that you are currently working for
13 have any property or inventory from which they work?
14     A. Do they have any property? Please repeat.
15     Q. Let me rephrase. Does the LLC own any tools?
16     A. No.
17     Q. Does the LLC own any equipment?
18     A. Not that I'm aware of.
19     Q. Have you ever received a rendition form and a
20 request from the El Paso Central Appraisal District to
21 submit a rendition of any personal property used in the
22 operation of Premier Builders?
23     A. I have never received one.
24     Q. Have you ever provided one?
25     A. No, I never have.

## Page 51

1     Q. Have you produced any of the books and records
2 of Premier Builders & Design, LLC?
3     A. No.
4     Q. Why not?
5     A. Since that's all the LLC questions -- since
6 it's my wife's company.
7     Q. Have you produced any of the documents
8 relating to RUF Developers, LLC or RUF, LLC?
9     A. The same, since it's my wife's company.
10     Q. What's the legal name of that entity, if you
11 know?
12     A. Of which one?
13     Q. RUF, R-U-F.
14     A. It's RUF Developers.
15     Q. You indicated that RUF does own a lot,
16 correct?
17     A. Yes.
18     Q. Who was that lot acquired from?
19     A. It was acquired from High Mountain, Limited.
20     Q. That's the one -- is that the one where
21 financing was provided?
22     A. Well, both of them. So the Premier Builders &
23 Design and the RUF Developers.
24     Q. So was the consideration of the promissory
25 note and deed of trust that Premier Builders is

## Page 52

1 obligated to repay?
2     A. Not on RUF developers.
3     Q. So it has a separate note --
4     A. Yes.
5     Q. -- and deed of trust?
6     A. Uh-huh.
7     Q. You were asked to provide the itemized list of
8 items purchased to build or renovate 724 Montoya Oak
9 Lane. Is that the financial statement that you provided
10 to me --
11     A. Yes.
12     Q. -- that we discussed earlier?
13     And the 356 Silver Star you likewise
14 produced for me?
15     A. Correct.
16     Q. You haven't done that for the Las Cruces
17 property that was acquired from Ms. Snow, have you?
18     A. No, since that was the LLC's, my wife's.
19     Q. And likewise, you haven't produced the costs
20 related to 354 Rocky Point, correct?
21     A. Correct.
22     Q. And that's because it's an LLC property?
23     A. Uh-huh.
24     Q. Is this a yes?
25     A. Yes.

## Page 53

1     Q. You were asked to produce a copy of the
2 certificate of completion and payment plan developed
3 with the credit counseling agency identified in your
4 original bankruptcy filing.
5     Is this the certificate of counseling
6 that you have produced here today?
7     A. Correct. And I asked Cheryl, and she said
8 since -- something about since I was upside-down there
9 was no payment plan.
10     Q. You indicated -- are you still paying for the
11 truck that you are driving?
12     A. No.
13     Q. Does your wife have a retirement account?
14     A. I mean, she does have a retirement account.
15     Q. And you have not produced the statements
16 related to the retirement account, correct?
17     A. Correct.
18     Q. Other than the loan applications that you have
19 provided, you have not provided any loan documents
20 related to the lots acquired by Premier Builders &
21 Design, LLC or by RUF Developers, LLC, correct?
22     A. Correct.
23     Q. And you have not done that because you contend
24 that they are your wife's separate property; is that
25 right?

## Page 54

1  A. Correct.
2  Q. The accountings that you have provided on the
3  construction of the homes for Premier Builders, would
4  there be receipts in there for the materials that were
5  purchased related to those properties?
6  A. Uh-huh. Yes. Or -- physical receipts --
7  Q. Yes.
8  A. -- you mean on the --
9  Q. Is there backup to the financial information
10  provided for those home constructions?
11  A. I mean, the main backup is -- pretty much
12  everything ran through my bank account, so I would use
13  that. I mean, I do have a lot of receipts.
14  Q. Are you on any medications today?
15  A. Huh-uh.
16  Q. Is that a no?
17  A. Oh, yes. No.
18  Q. Have you ever been in the military?
19  A. No.
20  Q. Have you ever been convicted of a crime?
21  A. No.
22  Q. Have you ever been arrested?
23  A. I won't answer that.
24  Q. What now?
25  A. I can't answer that.

## Page 55

1  Q. You can't answer that, or you won't answer
2  that?
3  A. No, I won't answer it.
4  Q. Have you ever been fired from a job for cause?
5  A. No.
6  (Exhibit marked, 3.)
7  Q. (BY MR. HAUGLAND) Let me hand you what's been
8  marked Exhibit 3 for identification. And I'll represent
9  to you that this is a copy of page 1 through 51 of your
10  initial bankruptcy filing, including the voluntary
11  petition and your schedules.
12  Do you recognize these documents?
13  A. Yes.
14  Q. Were these documents true and correct and
15  complete as of February 3, 2017?
16  A. Yes.
17  (Exhibit marked, 4.)
18  Q. (BY MR. HAUGLAND) Let me hand you what's been
19  marked Exhibit 4 for identification. Do you recognize
20  that document?
21  A. Yes.
22  A. These are the Statement of Financial Affairs
23  that you filed along with the petition and schedules
24  when you filed for bankruptcy, correct?
25  A. Yes.

## Page 56

1  Q. And to the best of your knowledge, were those
2  documents true and correct and accurate as of the date
3  of filing on February 3, 2017?
4  A. Yes.
5  (Exhibit marked, 5.)
6  Q. (BY MR. HAUGLAND) Let me hand you what's been
7  marked Exhibit 5 for identification. These are amended
8  Statement of Financial Affairs that I believe you filed
9  in your bankruptcy on March 21, 2017.
10  Do you recognize these documents as that?
11  A. Yes.
12  Q. And what did you change from your original
13  Statement of Financial Affairs to your amended Statement
14  of Financial Affairs?
15  A. I had forgot that I did the Jet Private Loan
16  financial statement for them.
17  Q. When you filed for bankruptcy, you indicated
18  that you were receiving $3,000 a month in income.
19  A. Correct.
20  Q. From what source?
21  A. From my parents.
22  Q. Have you had any other source of income in
23  2017?
24  A. No.
25  Q. Are your parents continuing to provide you

## Page 57

1  with $3,000 per month?
2  A. Yes.
3  Q. The Audi Q5, you indicated it was in your
4  wife's name only?
5  A. Yes.
6  Q. Are you making the payments on that loan?
7  A. I mean -- yes, she is.
8  Q. She is or you are?
9  A. I mean she is.
10  Q. When you closed on 356 Silver Star, who was
11  the seller of that property?
12  A. My d/b/a was.
13  Q. Did Premier Builders, LLC have anything to do
14  with that closing?
15  A. No. I don't think it was even formed yet at
16  that time.
17  Q. 356 Silver Star was sold for $675,000; is that
18  right?
19  A. Correct.
20  Q. And how much profit did you make off of the
21  Silver Star sale?
22  A. It's what I had in there. I mean, before
23  going through the taxes of 2016, it was like 10,000, I
24  believe.
25  Q. Whose bank account were the sales proceeds

## Page 58

1    from Silver Star deposited into?
2       A. It was deposited into my account, then I
3    transferred it to my father.
4       Q. And the account that the sales proceeds were
5    deposited in, would that be the account that you
6    provided me the statements for?
7       A. Correct. It's the 8381.
8       Q. On your loan application with Binary
9    Investments you stated your monthly gross income was
10   $9,000. What did you base that on?
11      A. When I did those loans I was just
12   projecting -- I was projecting to sell Montoya and
13   Silver Star in the same year, and for much more
14   anticipated profits. That didn't happen.
15       Are you asking on the Binary one?
16   Q. Yes.
17      A. Yes. The same thing. And the loan officer
18   said, Yes, just do your projected income for the
19   upcoming year.
20      Q. Are you continuing to get family assistance
21   after filing this bankruptcy petition?
22      A. Yes.
23      Q. Does your wife have a general contractor's
24   license?
25      A. Yes.

## Page 59

1      Q. Why?
2      A. Well, the LLC has the general contractor
3   license.
4      Q. Why?
5      A. Why does she have one?
6      Q. Yes, sir. Why does she have one?
7      A. In order to pull permits with the City.
8      Q. Does she have to have a license because you
9   don't?
10     A. I mean --
11      MR. NEVAREZ: I mean, I think that's
12   really just speculation as to why she has to have a
13   license because he doesn't.
14     A. I mean anybody could have a license. You can
15   go down to the City and pay $100.
16     Q. (BY MR. HAUGLAND) Is your general contractor's
17   license on hold with the City?
18     A. Yes, it is.
19     Q. Why?
20     A. Because of your client.
21     Q. She is able to stop a license from being
22   issued?
23     A. Uh-huh.
24     Q. How?
25     A. By nonstop calling the City and complaining

## Page 60

1    until they take initiative and falsely put it on hold
2    that way.
3      Q. City inspectors looked at my client's house
4    and found multiple problems with it. Hasn't the City?
5      A. I believe that -- I mean, I wouldn't say they
6    found the problems, but they went and inspected it.
7      Q. They didn't find anything wrong with it after
8    they inspected it?
9      A. Ron Roth told me what to do to get my license
10   off, and I did it, and then he went back on his word.
11   And not much I can do.
12     Q. Prior to pulling the license for her LLC, did
13   your wife have any construction experience?
14     A. I mean, if you look at most builders, a lot of
15   them don't have experience, you will come to learn. I'm
16   not saying she does or doesn't have experience.
17     Q. In order for your wife to open Premier
18   Builders & Design, LLC, did you have to give her
19   permission to use the name Premier Builders after you
20   had used it for several years?
21     A. No, I didn't, since mine was just a sole
22   proprietor, since that's an LLC.
23     Q. So she didn't ask for your permission to use
24   Premier Builders as the name of her LLC?
25     A. Huh-uh.

## Page 61

1      Q. Is that a no?
2      A. Oh, no.
3      Q. And so I understand, the first project that
4    Premier Builders did was the remodel of the Las Cruces
5    property, correct?
6      A. Correct.
7      Q. And the second project of Premier Builders &
8    Design, LLC is to build the house at Rocky Point?
9      A. Correct.
10     Q. And that price is listed for sale for how
11   much?
12     A. 898,000.
13     Q. And the financing for the Rocky Point house
14   has been provided by your father, Keith Young?
15     A. Correct.
16     Q. And there is a note and deed of trust on that
17   loan?
18     A. Correct.
19     Q. Have you had to sign that note or deed of
20   trust?
21     A. No. I'm not allowed to.
22     Q. Has your wife signed a personal guarantee on
23   that loan?
24     A. No, she hasn't.
25     Q. Why did your wife create RUF Developers, LLC

## Page 62

1  if she already had an LLC, Premier Builders?
2      A.  Just to have it under a separate holding.  It
3  was under the advice of Mr. Kirk.
4      Q.  Other than the two lots and the house that are
5  owned by your wife's LLCs, does it have any other
6  assets, to your knowledge?
7      A.  No, it doesn't.
8          MR. HAUGLAND:  Let's take a break.
9          (A break taken, 12:41 to 12:54.)
10     Q.  (BY MR. HAUGLAND)  Mr. Young, when you were
11 doing business as Premier Builders, did you send form
12 1099's to all your subcontractors?
13     A.  Yes, I did.
14     Q.  Were those form 1099's accurate?
15     A.  They should be.
16     Q.  Did you ever overstate in a 1099 any amounts
17 paid to subcontractors?
18     A.  I don't believe so.
19     Q.  How long have you been getting $3,000 a month
20 in family assistance?
21     A.  My father had been helping me for quite a
22 while because he can't stand what she did to me and this
23 whole situation.
24     Q.  Would he give you that $3,000 in a check or in
25 cash?

## Page 63

1      A.  It would be different, different each time.
2  Just -- I mean recently it's been 3,000.  It was
3  different in the past, different amounts.
4      Q.  Would you deposit it in your checking account?
5      A.  Sometimes.
6      Q.  Which checking account?
7      A.  Well, I mean, it would always be in 8381.
8      Q.  Is that your personal account or is that the
9  d/b/a account?
10     A.  The d/b/a.
11     Q.  In 2015 why were you making payments to
12 Escrow, Inc.?
13     A.  That was the Jet loan.  They use Escrow as
14 their agent -- I mean their -- to manage it, the
15 payments.
16     Q.  Who is George Rosales?
17     A.  He was one of my subcontractors.
18     Q.  Did he have a business name?
19     A.  No.  Most of those guys don't.
20     Q.  Which car did Bank of America finance?
21     A.  It was my F-250.
22     Q.  What financing did you have at FirstLight
23 Federal Credit Union?
24     A.  FirstLight?  I'm not sure.  I never had
25 financing there.

## Page 64

1          (Exhibit marked, 6.)
2      Q.  (BY MR. HAUGLAND)  Can you tell me what
3  Exhibit 6 is?
4          MR. NEVAREZ:  Let me see it.
5      A.  It was a car payment.
6      Q.  (BY MR. HAUGLAND)  For what car?
7      A.  It was my wife's.
8          (Exhibit marked, 7.)
9      Q.  (BY MR. HAUGLAND)  Let me hand you what's been
10 marked Exhibit 7.  What's that?
11     A.  Same thing.
12     Q.  It's a car payment that you made for your
13 wife?
14     A.  Yes, at that time.
15         (Exhibit marked, 8.)
16     Q.  (BY MR. HAUGLAND)  Let me hand you what's been
17 marked as Exhibit 8 for identification.  Can you tell me
18 what that is?
19     A.  That's for the Infinity car.
20     Q.  Who is Letty Mata?
21     A.  Letty Mata?  Oh, she is a drafter.
22     Q.  What plans has she drafted for you?
23     A.  She has done Silver Star.  She has done some
24 concept ones for me, too.  She did -- I think she did
25 hers (indicating).  Oh, no, no.  That was Rafead.  She

## Page 65

1  did Silver Star, and then she has just done some concept
2  drawings, too.
3      Q.  Who did the plans for 356 Rocky Point?
4      A.  Mata did.  No, that wasn't Mata.  I had the
5  architect.  What was his name?  Ed McCormick.
6      Q.  Ed McCormick?
7      A.  Uh-huh.
8      Q.  What checking account do you use since
9  September of 2016?
10     A.  That was my only one that I was using.  Oh,
11 since September?
12     Q.  Yes.
13     A.  I haven't really written any more checks since
14 then.
15     Q.  Have you understood my questions here today?
16     A.  Yes.
17     Q.  Are there any answers to any of my questions
18 that you would like to change at this point?
19     A.  No.
20         MR. HAUGLAND:  Thank you, sir, for
21 appearing here today.  I'll pass the witness.
22         MR. NEVAREZ:  I have no questions.
23         (Deposition concluded at 1:06 p.m.)
24
25

Page 66

C E R T I F I C A T E

STATE OF TEXAS )
COUNTY OF EL PASO )

I, Mary Procell, Certified Shorthand Reporter of the State of Texas, hereby certify that this transcription is a true record of the testimony given in said proceedings, and that said transcription is done to the best of my ability.

Given under my hand and seal of office on this 14th day of April, 2017.

_Mary Procell_
MARY PROCELL
Certified Shorthand Reporter
Of the State of Texas
Certificate Number 2812
Date of Expiration of
Certificate: 12/31/18
Firm Registration Number: 372

Page 67

CHANGES AND SIGNATURE
TRAVIS RYAN YOUNG                    APRIL 4, 2017
PAGE  LINE  CHANGE            REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Page 68

I, TRAVIS RYAN YOUNG, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
TRAVIS RYAN YOUNG

THE STATE OF _____ )
COUNTY OF _____ )

Before me, _____, on this day personally appeared TRAVIS RYAN YOUNG, known to me (or proved to me under oath or through _____) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2017.

_____
NOTARY PUBLIC IN AND FOR
EL PASO COUNTY, TEXAS
MY COMMISSION EXPIRES _____

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| TRAVIS RYAN YOUNG, | § | Case No.  17-30163-hcm |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| PAMELA YOUNG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No.  17-03010-hcm |
| | § | |
| TRAVIS RYAN YOUNG, Individually | § | |
| and d/b/a PREMIER BUILDERS, | § | |
| | § | |
| Defendant. | § | |

## NOTICE OF THIRD-PARTY REQUEST FOR PRODUCTION

TO:  KEITH YOUNG, who may be served at his usual abode located at 4532 Rhea, El Paso, Texas 79924.

PLEASE TAKE NOTICE THAT, pursuant to Federal Rule of Civil Procedure 45, you are requested to produce the documents and tangible things that are identified in the attached Exhibit A, "Documents To Be Produced." The items are to be produced to Corey W. Haugland, James & Haugland, P.C., 609 Montana Avenue, El Paso, Texas 79902, via United States Mail or hand-delivery, on or before October 20, 2017.

Client Files\0012806\00101\00510628.WPD          **SUBPOENA TO ISSUE**



EXHIBIT

P-2

Respectfully submitted,

JAMES & HAUGLAND, P.C.
P.O. Box 1770
El Paso, Texas 79949-1770
Phone:  915-532-3911
FAX: (915) 541-6440

By: _____

Corey W. Haugland
State Bar No. 09234200
Jamie T. Wall
State Bar No. 24028200
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Corey W. Haugland, hereby certify that on the ⏤ day of September, 2017, I electronically filed the foregoing NOTICE OF THIRD-PARTY REQUEST FOR PRODUCTION with the Clerk of the Court using the CM/ECF System, which will give notice of the filing of this instrument to:

Michael R. Nevarez
Law Offices of Michael R. Nevarez
P.O. Box 12247
El Paso, TX 79913

_____
Corey W. Haugland

**SUBPOENA TO ISSUE**

EXHIBIT "A"

DEFINITIONS

1.     The terms "you" or "your" or "Keith" as used herein refers to Keith Young, and where applicable, his agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with him or under his control.

2.     "Document" as used herein, means, by way of example and without limitations, the originals or true copies of the following items in your possession, custody, or control, or known to you or your counsel, whether printed, computerized, microfilmed, videotaped, recorded or reproduced by any other mechanical process or medium of expression, or written or produced by hand and whether or not claimed to be privileged, confidential, or personal: the final versions and all prior drafts of contracts; agreements; notes (including secretarial notes); notebooks; work notes; e-mails; work papers; communications (including intra-departmental communications and inter-company communications); correspondence; statements; reports; telegrams; agendas; forms; memoranda; bulletins; appointment books; logs; messages; diaries; texts; manuals; reference works and materials; samples of materials; depositions; analyses; projections; damage projections; forecasts; statistical Statements; financial records; reports; charts; brochures; purchase orders; estimates; computer inputs and outputs; calculations; expert reports; compilations of data; demonstrative evidence such as physical models, sketches, charts, graphs, plans, drawings, etc.; journals; billings; billing Statements and records; receipts; invoices; data compilations; slides; sketches; graphics; charts; movies; videotapes; photographs and the negatives thereof; summaries, records or minutes of meetings or conferences; expressions of Statements of policy; lists of people attending meetings or conferences; summaries, records, or reports of personal conversations or investigations; summaries, records, or reports of interviews; and all other writings, and any other similar matter, now or formerly in your possession, custody, or control or that of your counsel, or of any other agent, representative, employee, bookkeeper, accountant, expert or anyone else acting on your behalf, and includes documents used to support any conclusions or opinions reached. Any marginal comments appearing on any documents and any handwritten or other notations on any copy of a document render it original, requiring production of it or a true copy of it with such notations.

3.     The phrase "financial record" as used herein means, by way of example, and without limitations, the original or true copies of the following items, whether printed, computerized, recorded or reproduced by any other mechanical process, or written or produced by hand: monthly unaudited Statements and/or other periodic income and profit and loan Statements; periodic balance sheets; financial Statements or other Statements regarding, relating, or referring to your financial condition; federal and State income tax returns; volume of sales records; sales tax records and returns; payroll tax records and returns; cash disbursement journal(s); general ledger(s); receipts journal(s); accounts payable journal(s); and accounts

**SUBPOENA TO ISSUE**

receivable journal(s).

If you are a corporation the phrase "financial record" also includes shareholder records and other "documents" which discuss, relate, or refer to the purchase of stock by all shareholders, the number of shares held, sold, or otherwise acquired or dispensed by or to each shareholder, and any options to purchase shares; shareholder lists; franchise tax records and returns; minutes of Board of Directors' meetings; minutes of Shareholders' meetings; Articles of Incorporation and any amendments thereto; and Bylaws and any amendments thereto.

4.  The phrase "relate to" shall mean to name, to refer to either directly or indirectly, to comment upon, to analyze, review, report on, form the basis of, be considered in the preparation of, result from, or to have any logical relation or relevance to the entity, person, document, event or action pertaining to the subject matter upon which inquiry is made.

5.  "Travis Young" means and refers to Travis Ryan Young, individually and d/b/a Premier Builders, and where applicable, his agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with him or under his control.

6.  "Brittany" as used herein refers to Brittany Young, and where applicable, her agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with her or under her control.

7.  "Bay Homes" as used herein, refers to Premier Builders and Design, LLC d/b/a Bay Homes, and where applicable, its agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with it or under its control.

8.  "RUF Developers, LLC" as used herein, refers to RUF Developers, LLC, and where applicable, its agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with it or under its control.

9.  "RUF LLC" as used herein, refers to RUF LLC, and where applicable, its agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with it or under its control.

## INSTRUCTIONS

1.  If any document or response to this Request is withheld or objected to under a claim of attorney-client privilege, under a qualified privilege or for any other reason, you are instructed to identify each such document, as follows: (a) the date of the document; (b) the author and addressee(s); (c) all persons indicated as recipients of copies; (d) all persons known to you to have received the document and/or information or to have learned the substance of its contents; (e) the subject matter of the document and/or response; and (f) the specific privilege or objection alleged to be applicable or other reason for its being withheld or not answered.

2.  If you or any of your attorneys, agents or representatives had, at any time, possession or control of a document requested and such document has been lost, destroyed, purged or is not presently in your possession, custody or control, identify such document and describe the circumstances surrounding the loss, destruction, purge or separation from your possession, custody or control, indicating the dates that such circumstances occurred.

3.  If you allege that any Request contained herein is, in any manner, ambiguous, you are instructed to describe in detail the reasons for your allegations that the request is ambiguous including, but not limited to, each interpretation which you allege the specific request for discovery is subject to. Notwithstanding, you are instructed to respond, to the best of your ability, to the request for production and produce the documents requested.

4.  If you object to any of the Requests contained herein, you are instructed to identify, with specificity, the specific procedural rule(s) or substantive laws(s) upon which you base your objection.

5.  When producing documents responsive to this Request, you shall segregate the documents and affix a label to the document identifying the paragraph of this Request to which it is responsive.

## DOCUMENTS TO BE PRODUCED

For the time period from January 1, 2013 through January 31, 2017, please produce the following documents:

1. All documents related to or reflecting the loan of any money by you or any financing provided by you to Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

2. All documents related to or reflecting the gift of any money or other property by you to Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

3. All documents relating to your federal and state income tax returns together with the Form W-2s, Form 1099s, schedules and worksheets thereof and all other papers, and memoranda referring to any adjustment made in connection therewith for the previous four (4) years (2013, 2014, 2015, and 2016).

4. All documents relating to or reflecting any taxes paid on interest received from any loan of money by you to Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

5. All documents relating to monies received or being presently received by you from Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC, including but not limited to payment histories, ledgers, checks, monthly statements, deposit slips, records, accounts and memoranda.

6. All documents relating to debts which are owed to you by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC including but not limited to, promissory notes, IOU notes and/or accounts receivable

7. All contracts or agreements or documents memorializing contracts or agreements between you and Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

8. All documents memorializing communications by and between you and Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC relating to loans made by you to these persons or entities.

Client Files\0012806\00101\00510628.WPD          **SUBPOENA TO ISSUE**

9.     All documents memorializing any ownership interest you have in Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

10.    All documents memorializing your ownership of any assets that are in the possession of Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

11.    All documents memorializing the financial condition of Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

12.    All documents memorializing any loan applications by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

13.    All documents memorializing the financial condition of Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

14.    All documents submitted by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC to convince you to loan any of them money in order for them to engage in a construction project.

15.    All business proposals submitted to you by Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC.

**SUBPOENA TO ISSUE**

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| TRAVIS RYAN YOUNG, | § | Case No. 17-30163-hcm |
| | § | |
| Debtor. | § | |
| | § | |
| _____ | § | |
| | § | |
| PAMELA YOUNG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 17-03010-hcm |
| | § | |
| TRAVIS RYAN YOUNG, Individually | § | |
| and d/b/a PREMIER BUILDERS, | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF EL PASO | § |

Before me, the undersigned authority, personally appeared Keith Young, who, being by me duly sworn, deposed as follows:

"My name is Keith Young. I am over 18 years of age, competent to make this affidavit, and personally acquainted with the facts herein stated: I am the Records Custodian of Keith Young.

Attached hereto are _____ (___) pages of records. These records are kept by Keith Young in the regular course of business, and it was the regular course of business of Keith Young for Keith Young or an employee or representative of Keith Young with personal knowledge of the act, event or condition recorded to make the record or to transmit information thereof to be included in such record. The record was made at or near the time of the act, event or condition recorded or reasonably soon thereafter.

The records attached hereto are exact duplicates of the originals, and it is a rule of Keith Young to not permit the originals to leave the possession of Keith Young.

Further, Affiant sayeth naught."

_____
Keith Young

SUBSCRIBED AND SWORN TO BEFORE ME on the _____ day of _____, 20__.

_____
Notary Public in and for the
State of Texas

My Commission Expires:

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

_____WESTERN_____ District of ____TEXAS____

In re  TRAVIS RYAN YOUNG                            El Paso Division
_____
                  Debtor

*(Complete if issued in an adversary proceeding)*        Case No.  17-30163-hcm  ____

PAMELA YOUNG                                  Chapter  7  _____
_____
                  Plaintiff
                    v.
TRAVIS RYAN YOUNG, Individually and d/b/a Premier Builders  Adv. Proc. No.   17-03010-hcm  ____
_____
                  Defendant

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:   KEITH YOUNG
_____
            *(Name of person to whom the subpoena is directed)*

[x] *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  **See attached Notice of Third-Party Request for Production to Keith Young.**

| PLACE  609 Montana Avenue, El Paso, Texas 79902 | DATE AND TIME  October 20, 2017 – 3:00 p.m. |
|---|---|

[ ] *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   September 14, 2017
                  CLERK OF COURT

                                        OR    _____
_____                    _____
    *Signature of Clerk or Deputy Clerk*                  *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
 Pamela Young        , who issues or requests this subpoena, are:
 Corey W. Haugland, James & Haugland, P.C., 609 Montana Avenue, El Paso, Texas 79902  (915) 532-3911
                  Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

**EXHIBIT**

tabbies

P-3

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: ___ Keith Young
on *(date)* 09/15/17 .

☒ I served the subpoena by delivering a copy to the named person as follows: Keith Young, Kiki's Restaurant, 7719 Piedras, El Paso, Texas 79915
_____ on *(date)* September 29, 2017; or

☐ I returned the subpoena unexecuted because: _____
_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ –0– for travel and $ 60.00 for services, for a total of $ 60.00 .

I declare under penalty of perjury that this information is true and correct.

Date: 09/29/17

Server's signature

Enrique Chavez - PSC #10884
Printed name and title

7280 N. Mesa St. C-89, El Paso, Texas 79912
Server's address

Additional information concerning attempted service, etc.:

4532 Rhea
El Paso, TX 79924

Keith Young

Telephone: 915-821-5866 (Home)
915-494-7926 (cell)
email: Kyoung@elp.rr.com

RECEIVED OCT 30 2017

Corey W. Haugland
James & Haugland, P.C.
609 Montana Avenue
El Paso, TX 79902

October 27, 2017

Dear Mr. Haugland,

Please note the reply that is with this letter was to have been submitted to you by my son's Attorney.
I have just learned that the Attorney is no longer representing my son.

The answers not being provided by a lawyer may not be in the format you are expecting however,
they are correct and applicable.

Regards:

Keith Young

EXHIBIT

P-4

4532 Rhea
El Paso, TX 79924

Keith Young

Telephone: 915-821-5866 (Home)
915-494-7926 (cell)
email: Kyoung@elp.rr.com

RECEIVED OCT 3 0 2017

Corey W. Haugland
James & Haugland, P.C.
609 Montana Avenue
El Paso, TX 79902

October 27, 2017          RE: Third party request

Dear Mr. Haugland,

Pursuant to the request for third party production of documents I offer the following statements that will be answered with a line number correlating to the line number associated with the request. As well please note that when I reference Travis, or my son, it is referencing your request of (Travis Young, Brittany Young, Premier Builders, Premier Builders & Design LLC, Bay Homes, Premier Builders LLC, or RUF LLC.

#1, There are no documents to produce reflecting loans or interest regarding the parties mentioned. Monies loaned to my son were loaned without interest due in all cases. Principle amounts loaned would be seen from records Travis has already produced to you in your 2004 examination of the data.

#2, There has been no gift of monies or properties to Travis from myself, only monies loaned to assist him with development of his business.

#3, Object to this request, as this is confidential and privileged information. All of this would be evidenced in my Son's tax returns that you have already examined.

#4, As previously mentioned, there are no documents to produce as all monies that I have loaned my son have been interest free.

#5, Monies loaned to my Son have been paid by him and rolled back into other building projects. These monies would be evident in your 2004 examination of the data.

#6, Same answer as in the above (#5)

#7, There are no contracts to produce as this is my son, and all agreements have been verbal. The amount loaned was indicated in (#5)

#8, There are no documents to produce, as this is a simple rolling figure that is in the amount disclosed in question #5.

#9, There are no documents to produce as I have no ownership interest in my son's business.

#10, There are no documents to produce as my son has no assets in his possession that belong to me.

#11, I have no documents memorializing my sons financial condition, which I know of as currently Bankrupt.

#12, I have no documents memorializing any loan applications by my son.

#13, This is a repetitive question, the exact question asked in #11, the same answer exists, that is: " I have no documents memorializing my sons financial condition, which I know of as currently Bankrupt."

#14, My son has not needed to submit any documents to me to obtain financial assistance for a building project that I financed.

#15, The business proposals are those between my son and his clients, I have never asked or required him to submit a proposal for any of the homes that he has built.

Regards:

Keith Young

### JAMES & HAUGLAND, P.C.
ATTORNEYS AND COUNSELORS AT LAW

COREY W. HAUGLAND
JAMIE T. WALL
———
WILEY F. JAMES III – OF COUNSEL

609 MONTANA AVENUE
EL PASO, TEXAS 79902
———
(915) 532-3911
FACSIMILE: (915) 541-6440

November 17, 2017

Mr. Keith Young
4532 Rhea
El Paso, Texas 79924

Re:     Travis Ryan Young; Chapter 7 Bankruptcy Case No.  17-30163-hcm

       Pamela Young v.  Travis Young; Adversary Number 17-03010-hcm

Dear Mr.  Young:

      Thank you for your October 27, 2017 letter.  Unfortunately, your objections were received after the time when document production was due under the Subpoena.  Therefore, your out-of-time objections are not effective.

      Please advise if you will make the documents requested available for copying or if you will make a copy of everything and send it to me.  If I do not receive the documents on or before Friday, November 24, 2017, I will be filing a Motion with the Bankruptcy Court to compel production of those documents.  You would be well served in retaining counsel to represent you in this matter.  However, if you do not do so and you wish to discuss the foregoing, please do not hesitate to contact me.

      Very truly yours,

      JAMES & HAUGLAND, P.C.

      By:_____
            Corey W.  Haugland

CWH/jb

cc:     Pam Young, Via E-Mail

Client Files\0012806\00101\00511538.WPD

**EXHIBIT**
**P-5**

4532 Rhea
El Paso, TX 79924

RECEIVED NOV 2 2 2017

Keith Young

Telephone: 915-821-5866 (Home)
915-494-7926 (cell)
email: Kyoung@elp.rr.com

Corey W. Haugland
James & Haugland, P.C.
609 Montana Avenue
El Paso, TX 79902

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED & FIRST CLASS MAIL
7017 1000 0000 3503 9613**

November 21, 2017

Dear Mr. Haugland,

I have received your letter dated 11/17/2017 today and offer the following facts.

In your letter to me dated 10/26/17, you indicated that I was issued a Subpoena to produce information. In that communication you stated I was served this Subpoena on September 15, 2017. That date is inaccurate as it was served to me at 10:40 pm on September 29, 2017. I would have thirty days to respond to this request moving the due date to October the 29, 2017 (Sunday). So my response is within the parameters and not late, therefore my objections were "in-time" and are in-fact "effective".

My answers to your Subpoena are the same now as they were when you received my in time response, so be sure that if and when you file a Motion to compel production you clearly indicate my timeline here, disputing your inaccurate dates.

Regards:

Keith Young

Attachments: copy of first page of subpoena with dates written by person delivering such

```
EXHIBIT
P-6
```



IT IS HEREBY ADJUDGED and DECREED that the
below described is SO ORDERED.


Dated: December 12, 2017.

_____
H. CHRISTOPHER MOTT
UNITED STATES BANKRUPTCY JUDGE

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TRAVIS RYAN YOUNG | § | Case No. 17-30163-HCM |
| Debtor. | § | |
| PAMELA W. YOUNG | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 17-03010-HCM |
| | § | |
| TRAVIS RYAN YOUNG | § | |
| Defendant. | § | |

### ORDER REGARDING MOTION TO
### COMPEL, CIVIL CONTEMPT, AND SANCTIONS (KEITH YOUNG)

On December 12, 2017, the Court conducted a hearing on the Motion to Compel,
for Order of Civil Contempt, and for Sanctions Against Keith Young for Failure to Comply
With Subpoena ("Motion")(dkt# 39) filed by Pamela Young ("Plaintiff"). Mr. Keith Young
did not appear at the hearing, although he was provided with notice of the hearing and
the Motion. Mr. Carlos Miranda appeared on behalf of Mr. Keith Young, and as counsel
for Defendant. Mr. Corey Haugland appeared as counsel for Plaintiff.

Through the Motion, Plaintiff seeks to compel Mr. Keith Young to produce
documents in accordance with the Subpoena to Produce Documents directed to Keith
Young dated September 14, 2017 issued by Plaintiff in this adversary proceeding
("Subpoena")(dkts# 20, 24). Plaintiff also seeks to hold Mr. Keith Young in civil contempt
and sanctions for non-compliance with the Subpoena. The Court has considered the

1



EXHIBIT

P-7

Motion, the Subpoena, the letter objections dated October 27, 2017 and November 21, 2017 from Mr. Keith Young with respect to the Subpoena ("Objections"), and the statements and arguments of counsel. The Court finds that the following Order should be entered with respect to the Motion.

**IT IS THERFORE ORDERED AND NOTICE IS HEREBY GIVEN AS FOLLOWS:**

1. The Motion to Compel, for Order of Civil Contempt, and for Sanctions Against Keith Young ("Motion")(dkt# 39) filed by Pamela Young ("Plaintiff") is hereby GRANTED to the extent set forth below.

2. By January 3, 2018, Mr. Keith Young shall produce for inspection and photocopying to Plaintiff's counsel, all documents requested by Plaintiff in the Subpoena that are within Mr. Keith Young's possession, custody, or control.

3. By January 5, 2018, Mr. Keith Young shall also provide Plaintiff's counsel with a sworn written Response to the Subpoena, which shall set forth, by each specific Document Request in the Subpoena: (a) the responsive documents actually produced by Mr. Keith Young to Plaintiff's counsel; and (b) which requested documents could not be produced to Plaintiff's counsel because the documents do not exist. Mr. Keith Young may not respond to the Subpoena by stating that the documents have been or will be produced by some other person.

4. The Objections by Mr. Keith Young to the Subpoena are hereby DENIED, except for the following. Mr. Keith Young shall produce for inspection by Plaintiff's counsel the federal and state tax return documents sought by Document Request No. 3 in the Subpoena. Plaintiff's counsel may not photocopy such federal and state tax return documents, unless agreed to by Mr. Keith Young. If Plaintiff believes that the information in the federal and state tax return documents are relevant, Plaintiff may file a motion with the Court to permit photocopying of such documents.

5. If by January 3, 2018, Mr. Keith Young fails to produce the documents required by this Order, or if by January 5, 2018, Mr. Keith Young fails to provide the sworn Response to the Subpoena required by this Order, then Mr. Keith Young is hereby ordered to pay the amount of $1,600 in attorney's fees and expenses to Plaintiff's counsel and will be in civil contempt of Court. In such event, Plaintiff will also be entitled to seek additional and further relief and sanctions from the Court against Mr. Keith Young.

6. Mr. Carlos Miranda, as counsel for Mr. Keith Young, shall cause a copy of this Order to be served upon Mr. Keith Young.

7. Any relief requested in the Motion which is not expressly granted in this Order is hereby DENIED without prejudice.

# # #

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| TRAVIS RYAN YOUNG, | § | Case No. 17-30163-hcm |
| | § | |
| Debtor. | § | |
| | § | |
| ──────────────────────── | § | |
| | § | |
| PAMELA YOUNG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 17-03010-hcm |
| | § | |
| TRAVIS RYAN YOUNG, Individually | § | |
| and d/b/a PREMIER BUILDERS, | § | |
| | § | |
| Defendant. | § | |

## ORDER GRANTING PLAINTIFF'S SECOND MOTION TO COMPEL AND FOR SANCTIONS AGAINST KEITH YOUNG



EXHIBIT

P-8

Against Keith Young (hereinafter the "Motion"). The Court, after reviewing the Motion and the response filed, if any, as well as the evidence and arguments of counsel finds that the Motion is well taken and should be, in all things, Granted. It is therefore,

**ORDERED, ADJUDGED and DECREED** that Plaintiff's Second Motion to Compel and for Sanctions Against Keith Young is GRANTED and that Keith Young is hereby ordered to produce the requested documents as set forth in the Court's December 12, 2017 Order Regarding Motion to Compel, Civil Contempt, and Sanctions (Keith Young) [Adv. Doc. # 48] **within 14 days of the date of this Order**. It is further,

**ORDERED, ADJUDGED and DECREED** that Keith Young pay the sum of $1,600.00 to Plaintiff for failing to comply with the December 12, 2017 Order [Adv. Doc. # 48] **within 14 days of the date of this Order**. It is further,

**ORDERED, ADJUDGED and DECREED** that Keith Young, pay Plaintiff the amount of $2,200.00 as reasonable and necessary attorney's fees incurred in bringing forth this Motion and for attending hearing on same **within 14 days of the date of this Order**.

Plaintiff shall have all writs and process necessary to collect this fee award.

### ###

Submitted by:
Corey W. Haugland
State Bar No. 09234200
JAMES & HAUGLAND, P.C.
609 Montana Avenue
El Paso, Texas 79902
Phone: 915-532-3911
FAX: (915) 541-6440